UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MATTHEW GILLIS,

        Plaintiff,                    Case No. 14-cv-12518

v                                          Honorable Thomas L. Ludington

BAY COUNTY SHERIFF JOHN MILLER, in his
Official and Individual Capacities,

        Defendants.
_____/

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DISMISSING COUNT I OF PLAINTIFF'S COMPLAINT WITH PREJUDICE, DISMISSING COUNT II OF PLAINTIFF'S COMPLAINT WITHOUT PREJUDICE, DENYING DEFENDANTS' MOTIONS *IN LIMINE* AS MOOT, AND DENYING MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF**

    Like its companion case[1], this case may raise many legitimate questions. It does not, however, raise a question of First Amendment retaliation. Pled only as such, this case must be dismissed.

    Defendants Bay County Sheriff's Department and Bay County Sheriff John Miller move for summary judgment on all of Plaintiff Matthew Gillis's claims. *See* Defs.' Mot. Summ. J., ECF No. 25. Gillis claims that Defendants violated both federal and Michigan law by terminating his employment on April 15, 2014. *See* Pl.'s Compl. ECF No. 1. According to Gillis, his termination was retaliation for the exercise of his First Amendment rights, a violation of 28 U.S.C. § 1983. Defendants also, according to Gillis, violated the Michigan Public Employment Relations Act and Whistleblowers' Protection Act by terminating him.

    Defendants disagree and have moved for summary judgment on Gillis's claims. They argue that Gillis has not established a genuine dispute of material fact that his First Amendment

---

[1] *Walraven v. Miller and the Bay County Sheriff's Department,* Case No. 14-cv-12517

rights were violated. Further, Defendants claim he cannot demonstrate a connection between his union activity and his termination, a showing necessary to maintaining a PERA claim. Lastly, Defendants argue that Gillis cannot demonstrate that his case meets the elements of a Whistleblowers' Protection Act claim.

Because Gillis does not have a cognizable First Amendment retaliation claim, that count of his complaint will be dismissed with prejudice. Gillis's remaining state law causes of action will be dismissed without prejudice.

## I.

Plaintiff Matthew Gillis is a former Correctional Facility Officer ("CFO") at the Bay County Jail. In January 2014 Plaintiff Gillis was elected President of the corrections officer's union, Bay County Corrections of the Police Officers Association of Michigan ("CO Union"). He alleges that he was constructively discharged from his position with the Bay County Jail on February 27, 2014.

Defendant Bay County Sheriff's Department is the law enforcement agency of the Bay County government. The Sheriff's Department is tasked with the administration of the Bay County Jail. Defendant John Miller is the Bay County Sheriff.

What follows is a brief summary of the facts that gave rise to this lawsuit. They are not necessarily the facts that are germane to Gillis's legal claims. Indeed, those facts are few. Understanding and placing the facts relevant to Gillis's claims in context, however, requires a broader understanding of the activity in the Bay County Jail in late 2013 and early 2014. That chronicle is what follows.

### A.

Beginning in late 2013, conduct occurred at the jail that led to a series of internal investigations being conducted. In total, three internal investigations were conducted with one employee being reprimanded, one terminated, and another resigning. The employee that resigned was Gillis. All three of the investigations began in early 2014 and concluded within a few months.

**1.**

The first investigation revolved around allegations that Captain Troy Stewart, the jail administrator at the Bay County Jail, had illegally provided an inmate with prescription mouthwash. As Jail administrator Stewart is tasked with the "care and custody" of the inmates. Shore Dep. 64, Ex. R, Def.'s Mot. Summ. J., ECF No. 25. In early 2014 Stewart procured a bottle of prescription mouthwash for an inmate suffering from rather severe halitosis. Stewart procured the bottle through his wife, at the time a dental assistant. But since the inmate could not leave the jail to be examined by an outside dentist, and because the inmate was not a patient of this dentist, Stewart had the bottle prescribed to his wife. He then picked up the bottle of mouthwash at the pharmacy, scratched off his wife's name, and left the bottle, with use instructions, for the inmate.

The information that Stewart procured this mouthwash for an inmate spread throughout the jail, and it was rumored that the mouthwash contained codeine cough syrup, a controlled substance. Word spread from the inmates to the jail staff. When tale of the mouthwash grew, Stewart decided that he should report to Undersheriff Troy Cunningham that he had brought the mouthwash into the jail.

Upon learning of Stewart's conduct, Sheriff Miller ordered an investigation. Miller Dep. 10-11, Ex. T, Def.'s Mot. Summ. J., ECF No. 25. Miller appointed Sergeant Michael Shore to

conduct the investigation. *Id*. The investigation began on January 13, 2014 and involved interviewing a number of individuals in the jail, including Stewart. Shore Dep. 11, 16.

Because of the claims that the mouthwash was a controlled substance smuggled into the jail, Sergeant Shore treated the investigation as one into criminal activity. Shore Dep. 21-22. This could result in a number of different outcomes, including prosecution. As a result, all individuals interviewed were instructed not to discuss the investigation with anyone but the Sheriff and Undersheriff. *See, e.g.*, Shore Interview Notes, Ex. U, Def.'s Mot. Summ. J., ECF No. 25. Despite being treated as a criminal investigation, the investigation events were never memorialized in a police report, as is common. Shore Dep. 23-24. This was done at the direction of Undersheriff Cunningham. *Id*.

This first investigation concluded on February 27, 2014 with Sergeant Shore furnishing a report to Sheriff Miller in early March. The report was forwarded to the Bay County Prosecutor on March 10, 2014. See Case Review Sheet, Ex. U, Def.'s Mot. Summ. J. 22, ECF No. 25. On March 25, 2014, the Bay County Prosecutor reviewed Sergeant Shore's report and declined to prosecute, noting "lack of criminal intent – insuff. evid to establish violation of criminal statutes." *Id*. (sic throughout).

A copy of the report was also sent to the Sheriff. On the basis of the report, Sheriff Miller met with Captain Stewart to discuss and respond to the allegations of his conduct. Following that meeting, Sheriff Miller issued a letter of reprimand to Captain Stewart. Sheriff Miller wrote:

> Pursuant to your meeting on April 4, 2014, you were given an opportunity to respond to allegations made that you supplied drugs to prisoners. While the facts show that you did not, you were actually looking out for the welfare of the prisoner in question. You did use poor judgment. I hope that no further incidents of similar nature occur.
>
> I have no choice but to place a letter of reprimand in your file. This will remain in your file subject to review at a later date.

Letter of Reprimand, Ex. U, Def.'s Mot. Summ. J., ECF No. 25.

**2.**

Sergeant Shore's second investigation commenced soon after the mouthwash incident and revolved around Sergeant Walraven, a supervising CFO at the Bay County Jail and a friend of Plaintiff Matthew Gillis.[2] An allegedly anonymous report of misconduct was brought to jail administration's attention by a note slipped under the door of Undersheriff Cunningham on January 23, 2014. The note simply requested that Undersheriff Cunningham review jail security footage from the night shift "on certain dates and at certain times." Cunningham Aff., Ex. W, Def.'s Mot. Summ. J., ECF No. 25. The security footage from the dates and times listed in the note showed CFOs "engaged in numerous unacceptable activities, including cell phones in the jail, playing cards for extended periods of time, damaging jail property, conducting outside business when in the jail[,] not monitoring video security cameras as necessary[,] and various other violations of department policy." *Id*. Plaintiff Matthew Gillis was present during these shifts. *Id*. Undersheriff Cunningham ordered Sergeant Shore to conduct an investigation into "any improper employee practices by the CFO's [sic] on duty and shared the information on the tapes with him." *Id*.

In Undersheriff Cunningham's deposition, he makes no mention of this "kite" but instead states more generally that "some employees complaining" about Sergeant Walraven led to Shore's investigation. Cunningham Dep. 9, Ex. 10, Pl.'s Resp., ECF No. 29. He also admits that he was aware of employees making comments to Sergeant Shore about Walraven during the investigation into Captain Stewart. *Id*. at 9-10. One interview where the topic of Walraven arose was Sergeant Shore's interview with Deputy Jeff Sargeson. *See* Shore Interview Notes, Ex. U.

---

[2] Sergeant Walraven's eventual termination spawned the companion case, *Walraven v. Miller and the Bay County Sheriff's Department,* Case No. 14-cv-12517.

Sergeant Shore interviewed Deputy Sargeson on January 17, 2014, one week before the "kite" was slipped under Undersheriff Cunningham's door.[3]

Sergeant Shore began his investigation into Sergeant Walraven's conduct on January 27, 2014. *See* Shore Interview Notes, Ex. Z, Def.'s Mot. Summ. J., ECF No. 31-27. Sergeant Shore conducted the final interview in the Walraven investigation on March 4, 2014. *Id*. During this interview, Cosineau made a number of allegations concerning Walraven's conduct, or misconduct. Cosineau relayed to Sergeant Shore that Walraven was "fired up" about the investigation into Captain Stewart's conduct. Cosineau told Sergeant Shore that Walraven believed that the investigation should be conducted by the Michigan State Police. Further, Walraven apparently told Cosineau (who then told Shore) that if the administration started "'going after' employees over this" Walraven would go "right to the Bay City Times to let them know." Shore Interview Notes, Ex. Z. Relevantly, Cosineau also told Sergeant Shore that he heard Plaintiff Matthew Gillis and Sergeant Walraven discussing the possibility of going to Human Resources concerning the way the investigation into Captain Stewart was being conducted. *Id*. Despite the investigation being non-criminal, Sergeant Shore requested that each interviewee not share anything discussed in the interviews. *Id*.

**B.**

During this time period, Plaintiff Gillis allegedly received numerous complaints about Sergeant Shore's investigations of the staff in his capacity as president of the CO union. According to Gillis, at least two employees informed him that Sergeant Shore had stated "if you don't have anything to hide, why would you need union representation." In response to these

---

[3] Despite Undersheriff Cunningham's apparent knowledge of the complaints against Walraven in the Stewart Investigation interviews, Sergeant Shore testified during his deposition that the investigation of Walraven was initiated by the "kite" under Undersheriff Cunningham's door.

- 6 -

complaints, Plaintiff Matthew Gillis decided to place a notice on an employee bulletin board in the Bay County Jail on February 12, 2014 (the "Notice"). The memo stated:

> Hello everyone I would like to express my gratitude in being your Union President. I feel there is a very important issue that needs to be discussed. Many deputies have been notified they need to report to a superior officer for some type of investigatory interview or investigation. When you are summoned before a superior officer, I strongly suggest you state these words before you say anything else. "If this discussion could in any way lead to me being discipline or discharged, I request that my Union representative be present at the meeting. Without representation, I choose not to answer any questions." These rights also cover yourself in the event someone else may be disciplined due to your statement. I am in no way advising you not to cooperate with management, just advising you of your rights.
>
> It is your responsibility to ask for the representation. It is not the responsibility of management to advise you of this. Attached are the actual Weingarten Rights. Please review them as they are extremely important for yourself and everyone else. Even if you don't think you need representation, it has been proven it is better to have another set of ears as sometimes words are taken out of context.
>
> In conclusion you have the right to discuss union matters with your Union President and Vice President. Some of you may have been ordered not to discuss what was said in a meeting with your superiors. I strongly recommend you advise us of what happened for your protection and others. Again, thank you for your time and I look forward to working with everyone.

Compl. ¶ 13.

At least one employee, Jeff Kerbleski, expressed concern over the Notice and brought his concern to Captain Stewart, the jail administrator. *See* Kerbleski Aff., Ex. Q, Def.'s Mot. Summ. J., ECF No. 25; Stewart Dep., 83-84.[4] Kerblewski was specifically concerned with the language that read "Some of you may have been ordered not to discuss what was said in a meeting with your superiors. I strongly recommend you advise us of what happened for your protection and others." He believed the language improperly placed the blame for possible employee discipline on employees that were interviewed as part of the investigations. *Id*.

---

[4] CFO Jeff Kerbleski signed an affidavit explaining that he expressed concern over the Notice to Captain Stewart. Captain Stewart's deposition does not reflect hearing from Kerbleski but does indicate that he was notified of the Notice by Sergeant Jeff Vanness and after hearing from Vanness, reported the Notice to Undersheriff Cunningham.

Captain Stewart passed these concerns on to Undersheriff Cunningham. Eventually, Sheriff Miller was informed of the Notice and scheduled a meeting with Gillis on February 13, 2014. Undersheriff Cunningham and another union representative (besides Gillis), John Oliver, were present. At the meeting, Sheriff Miller angrily confronted Gillis about the Notice. Gillis Dep. 19, Ex. 13, Pl.'s Resp., ECF No. 29. Sheriff Miller asked Gillis if he wrote the Notice. Gillis admitted that he did, with help from Sergeant Walraven. *Id.* During the conversation, Sheriff Miller went on to threaten Gillis with possible criminal prosecution for posting the Notice. Gillis was never prosecuted, nor is there any evidence that Sheriff Miller did any more than threaten prosecution.

**C.**

The third and final investigation involved Plaintiff Matthew Gillis, and began on February 26, 2014. While assisting the Michigan Department of Correction in locating parole absconders, road patrol Deputy Ben Latocki arrived at a residence in which former Bay County Jail inmate Shelly Guidroz was hiding. After determining that Ms. Guidroz had two outstanding warrants for her arrest, Deputy Latocki took her into custody and transported her to the jail.

While en route to the jail, Ms. Guidroz claimed that she had been having sexual relations with Plaintiff Gillis for the past year. Ms. Guidroz claimed that she had sexual relations with Gillis numerous times while she was on probation, and even while she was in custody at the jail between October 2011 and October 2012. Deputy Latocki informed Undersheriff Cunningham of Ms. Guidroz's allegations, and Cunningham in turn requested that Sergeant Shore commence yet another investigation into the allegations. Undersherriff Cunningham also downloaded the contents of Ms. Guidroz's phone, which contained texts, photos, and videos documenting her sexual relationship with Plaintiff Gillis.

The next day, February 27, 2014, Gillis, Gillis's local union representative, and Dan Kuhn, a business agent and executive board member with the Officer's union, met with Sergeant Shore, Captain Stewart, and Undersheriff Cunningham regarding Ms. Guidroz's allegations. Gillis initially denied having any sexual relations with Ms. Guidroz, despite the fact that video evidence suggested otherwise. Kuhn Depo. 20 ECF No. 25 Ex. C. Kuhn and Gillis then caucused, and Kuhn informed Gillis of the serious nature of the allegations and the importance of being forthcoming. *Id.* at 20-23. After more discussion, Gillis tendered a resignation letter stating "I Matt Gillis as of todays [sic] date resign as a corrections officer of the Bay County Jail." ECF No. 25 Ex. B. Defendants allege that Plaintiff Gillis voluntarily resigned from his position in the face of the investigation into his sexual misconduct. Plaintiff Gillis alleges that he was constructively discharged in retaliation for engaging in protected speech and affiliating himself with the CO Union.

**II**.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).

The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Id.* at 251-52. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

**A.**

Defendants first move for summary judgment on Gillis' 42 U.S.C. § 1983 claim. § 1983 provides in relevant part:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

*Id.* In the first count of his complaint, Plaintiff alleges that Defendant Sherriff Miller violated § 1983 by retaliating against him for exercising his right to freedom of speech and expression as protected by the First Amendment of the United States Constitution. Compl. ¶¶ 38-56.

Defendants argue that the claim should be dismissed for the following reasons: (1) Gillis cannot maintain a § 1983 claim against Sherriff Miller in his official capacity as Sheriff of Bay County because he has failed to raise a genuine issue of material fact that the Bay County Sheriff's Department has a policy or custom that caused the alleged First Amendment violation; (2) Gillis has not established a prima facie case of First Amendment Retaliation; (3) Gillis was not engaged in protected activity when he posted the Notice; (4) Gillis did not suffer any injury or adverse action by Defendants; (5) Sherriff Miller is entitled to qualified immunity in his individual capacity; and (6) The Notice was not a substantial or motivating factor in Gillis's interview prior to his resignation. Defendant's second claim will be addressed first.

Defendants argue that Plaintiff Gillis cannot establish that Sherriff Miller caused him any injury because Gillis has not established a prima facie case of First Amendment Retaliation. To establish a claim under § 1983 a "plaintiff must establish both that 1) []he was deprived of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). A public employee bringing a First Amendment retaliation claim under § 1983 must demonstrate:

> (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by his protected conduct.

*See Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006). If a plaintiff satisfies these three elements, then the burden shifts to the defendant to establish, by a preponderance of the evidence, that it would have acted the same even absent the plaintiff's protected activity.

To satisfy the first prong, an employee must show that he was engaged in constitutionally protected speech or conduct. *Id*. "While public employees may not be required to sacrifice their First Amendment free speech rights in order to obtain or continue their employment, a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions." *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir.2003) (internal citations omitted). Therefore, in the case of governmental employees, a plaintiff must establish that: (1) his speech touched on matters of public concern; and (2) his interest in commenting on the matter of public concern outweighs the County's interest in promoting the efficiency of the public service it performs through its employees. *See Cockrel v. Shelby County School Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001); *Pickering v. Board of Ed. Of Tp. High School Dist. 205 Will*

*County, Ill.*, 391 U.S. 563 (1968). Speech that touches on matters of public concern has been defined by the Supreme Court as "speech relating to any matter of political, social, or other concern to the community." *Dye*, 702 F.3d at 295 (quoting *Connick*, 461 U.S. at 146).

1.

The speech at issue is Gillis's posting of the Notice. *See* Compl. ¶44 ("The Plaintiff engaged in protected activity by posting a memorandum addressing Defendant's investigation into potential criminal acts taken by the jail administrator and Defendant's potential violation of employees' rights."). Gillis argues that his speech addresses matters of public concern because it was posted in the context of insuring the department operated in accordance with the law. *See Marohnic v. Walker,* 800 F.2d 613 (6th Cir. 1986) ("Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law"). Defendants argue that Gillis posted the Notice in his capacity as an employee and union representative, not as a private citizen.

The fact that speech or expression takes place within a government office does not in itself require a finding that the speech touches on matters of public concern. *Connick v. Myers*, 461 U.S. 138, 149 (1983). The Supreme Court has held that when a public employee speaks as an employee upon matters of personal interest instead of as a citizen upon matters of public concern "absent the most unusual circumstance, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* at 147. Furthermore, "an employee's speech, activity or association, merely because it is union-related, does not touch on a matter of public concern as a matter of law." *Akers v. McGinnis*, 352 F.3d 1030, 1038 (6th Cir. 2003) (*citing Boals v. Gray,* 775 F.2d 686, 693 (6th Cir. 1985). Instead, "[w]hether an employee's speech addresses a matter

of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48.

In reviewing the content of Gillis's statement, the "pertinent question is not *why* the employee spoke, but *what* he said." *Id.* at 591 (citing *Connick,* 461 U.S. at 574-75. Here, the content of Gillis's statement was an explanation of fellow employees' right to union representation and a request that employees share the subject-matter of confidential disciplinary meetings with union representatives. The form of Gillis's statement was a Notice posted on the employee board inside the Bay County Jail. Gillis made his statement in the context of two unrelated office investigations regarding work-related employee misconduct and discipline. The statement was neither made to the public nor disseminated to the public, nor did the statement contain any information that would be needed by or helpful to the public in making informed decisions about the operation of government. *See Farhat v. Jopke*, 370 F.3d 580, 590 (6th Cir. 2004).

Gillis argues that his speech was union speech implicating protected *Weingarten* rights and thus is *per se* a matter of public concern. In *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251 (1975), the United States Supreme Court upheld the National Labor Relations Board's conclusion that "an employer's denial of an employee's request to have a union representative present at an investigatory interview, which the employee reasonably believed might result in disciplinary action, was an unfair labor practice." *National Aeronautics and Space Admin v. Federal Labor Relations Authority*, 527 U.S. 229, 236 (1999). The Court reasoned that such

representation was required under § 7 of the NLRA, which protects employees' right to engage in concerted activities. *Id.* (citing *Weingarten*, 420 U.S. at 260). [5]

But just because employees possess the right to have a union representative present at an investigatory interview, it does not follow that an employee and union representative advising other employees of that right has the absolute protection of the First Amendment. Gillis has provided no authority supporting that proposition. One court has considered the claim that advising employees of their *Weingarten* rights is protected speech. *See Lada v. Delaware Cty. Cmty. Coll.*, Case No. 08-CV-4754, 2009 WL 3217183, at *4 (E.D. Pa. Sept. 30, 2009). It held that such speech does not warrant any heightened First Amendment protection. In fact, it noted that speech directed at union activity within the workplace does not implicate a matter of public concern. *Id.*

Additionally, in *Gorum v. Sessoms*, 561 F.3d 179, 187 (3d Cir. 2009), the Third Circuit concluded that a professor speaking out on behalf of a student in the student's disciplinary proceeding was not public speech. It stated that "[t]here is no proof that he thought any public policy issues were at stake." *Id.* at 187. The court went on to note that even if the speech of the professor raised public issues, the speech must still be subject to the context-dependent First Amendment inquiry into "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-489. A fact emphasized by the Sixth Circuit in *Akers v. McGinnis*, 352 F.3d 1030, 1038 (6th Cir. 2003), when it held that "an employee's speech, activity or association, merely because it is union-related, does not touch on a matter of public concern as a matter of law."

---

[5] Any unfair labor practices claim would necessarily be litigated in the first instance in front of the National Labor Relations Board. The parties give no indication that this issue has been brought before the NLRB or that there was ever an allegation of unfair labor practices made by Gillis or any other employee of the jail.

Also, beyond simply addressing employees' union rights, the Notice "strongly recommend[ed]" that Sheriff's Department employees advise union leadership "of what happened [in the interviews] for [their] protection and others." Defs.' Mot. Summ. J., Ex. AA, ECF No. 31-28. At best, this can be characterized as an expression of concern with the manner in which Department management was investigating alleged misbehavior by its employees. Such concerns, to the extent they are the basis for an employee's speech, "do not touch upon a matter of public concern and therefore fall outside the scope of First Amendment-protected speech." *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) (excluding from First Amendment protection "complaints about an employer's performance" (quoting *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001)).

Gillis argues that because he had previously suggested that he might go to the Bay City Times and Bay County Human Resources to disclose alleged public corruption, the purpose of his proposed, hypothetical speech should be imputed to his actual act of posting the Notice. While Gillis may claim that he intended to go public with allegations of public corruption, he did not in fact do so, and intentions are irrelevant to the question of what statement was actually made. Consequently, no such allegations of public corruption are at issue in this case. By its plain language, Gillis's statement was made to inform employees that were interviewed pursuant to work-related investigations of their rights to union representation. Gillis's posting of the Notice was not speech touching on matters of public concern.

### 2.

Even if Gillis could show his speech touched on matters of public concern, he cannot show his interest in commenting on the matter of public concern outweighs the County's interest

in promoting the efficacy and efficiency of the sheriff's office. *See Cockrel*, 270 F.3d at 1048; *Pickering*, 391 U.S. at 568. As explained by the Sixth Circuit:

> In order to justify a restriction on speech of public concern by a public employee, plaintiff's speech must impair discipline by superiors, have a detrimental impact on close working relationships, undermine a legitimate goal or mission of the employer, impede the performance of the speaker's duties, or impair harmony among co-workers. The state bears the burden of showing a legitimate justification for discipline.

*Meyers v. City of Cincinnati*, 934 F.2d 726 (6th Cir.1991). Courts have emphasized that municipalities should be granted considerable deference in structuring and discouraging public dissension within its safety forces due to the substantial interest in maintaining an efficient organization to carry out law enforcement duties. *See, e.g. Brown v. Ticy of Trenton,* 867 F.2d 318, 322 (6th Cir. 1989); *Kannisto v. San Francisco*, 541 F.2d 841, 844 (9th Cir. 1967). The Sixth Circuit has specifically referred to County Sheriff's Departments as a "paramilitary organizations." *Cherry v. Pickell*, 188 Fed.Appx. 465, 471 (6th Cir. 2006). Defendants have carried their burden of showing that Gillis's Notice had great potential to impair discipline by superiors, undermined legitimate employer investigations, and impair harmony among co-workers.

Even if Gillis's speech advising employees of their *Weingarten* rights was a matter of public concern, and it is not, the Notice contained non-*Weingarten* speech. The final portion of Gillis's Notice stated, "Some of you may have been ordered not to discuss what was said in a meeting with your superiors. I strongly recommend you advise us of what happened for your protection and others." While the rest of the Notice may have properly advised Sheriff's Department employees of their rights under *Weingarten*, this portion of the Notice did not. This directive to discuss confidential disciplinary meetings with union representatives is not a protected concerted activity under *Weingarten* or § 7 of the NLRA.

Gillis's suggestion that employees disclose the contents of interviews went against direct orders of superiors in the Sheriff's Department. It threatened the confidentiality and integrity of an investigation into employee misconduct at the jail, and threatened an investigation into the potentially criminal conduct of a jail employee. Thus, even if speech relating to *Weingarten* rights is public speech for purposes of the First Amendment,[6] Gillis cannot show that the disputed portion of the Notice was protected under *Weingarten*. He also cannot show that his interests in posting that portion of the Notice outweighed Defendants' strong interest in efficiently running the County Sherriff's office. Because Gillis can do neither of these things, he cannot show that he was engaged in constitutionally protected speech. Accordingly, he cannot sustain a cause of action under 28 U.S.C. § 1983.

Gillis's inability to establish the first prong of a 28 U.S.C. § 1983 action—that he was deprived of a right secured by the Constitution or laws of the United States—means any further analysis of his claim and Defendants' arguments for its dismissal are unnecessary.

**B**.

Because Plaintiff's federal claim will be dismissed on its merits, Plaintiff's related State law claim will be dismissed without prejudice. A federal court may exercise supplemental jurisdiction over a plaintiff's state law claim if it forms part of the same controversy as the federal claim. *See* 28 U.S.C. § 1367(a). A federal court may decline to exercise supplemental jurisdiction if:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

---

[6] And again, there is no law supporting that proposition. Every court to address the issue, including the Sixth Circuit, has held that union speech does not, as a matter of law, touch on a matter of public concern.

> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). When a plaintiff's federal claims have been dismissed on the merits, the question of whether to retain jurisdiction over any state law claims rests within the Court's discretion. *Blakely v. United States*, 276 F.3d 853, 860 (6th Cir. 2002). However, the dismissal of the claim over which the federal court had original jurisdiction creates a presumption in favor of dismissing without prejudice any state-law claims that accompanied it to federal court. *Id*. at 863. In addition, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). The issues presented are more appropriate for resolution by a state court and therefore the Court declines to exercise its supplemental jurisdiction. Plaintiffs' supplemental state law claims will therefore be dismissed without prejudice.

### III.

Accordingly, it is **ORDERED** that Defendants Bay County Sheriff's Department and Bay County Sheriff John Miller's Motion for Summary Judgment, ECF No. 25, is **GRANTED.**

It is further **ORDERED** that Count 1 of Plaintiff Matthew Gillis's Complaint, ECF No. 1, is **DISMISSED with prejudice**.

It is further **ORDERED** that Count 2 of Plaintiff Matthew Gillis's Complaint, ECF No. 1, is **DISMISSED without prejudice**.

It is further **ORDERED** that Defendants' Motions *in Limine*, ECF Nos. 39, 40, 41, & 42, are **DENIED as moot**.

- 19 -

It is further **ORDERED** that Plaintiff Matthew Gillis's Motion for Leave to File Supplemental Brief, ECF No. 51, is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: January 28, 2016

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 28, 2016.

s/Michael A. Sian
MICHAEL A. SIAN, Case Manager